*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | |
|---|---|
| *UNITED STATES OF AMERICA* ) | |
| ) | |
| *v.* ) | *Criminal No. 06-13-P-H* |
| ) | |
| *JUSTIN WOODBURY,* ) | |
| ) | |
| *Defendant* ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Justin Woodbury, charged with being a felon in possession of a firearm (a Star Bonifacio Echeverria Firestar model .40-caliber pistol bearing serial number 2037122) in violation of 18 U.S.C. §§ 922(g)(1) and 924(a), seeks to suppress evidence obtained pursuant to what he asserts was the unlawful entry of his apartment at #7 Leisure Lane, Windham, Maine on or about September 9, 2005. *See* Motion To Suppress Evidence, etc. ("Motion") (Docket No. 12) at 1-3; Indictment (Docket No. 1). For the reasons that follow, I recommend that the Motion be denied.

**I.  Factual Backdrop**[1]

On September 9, 2005 Ernest W. MacVane III, a Windham, Maine police officer cross-designated and federally deputized as a task-force agent of the federal Drug Enforcement Administration, applied for a warrant to search "#7 Leisure Lane[,] Windham, Maine[,] believed to be

---

[1] No evidentiary hearing was held with respect to the instant motion, which challenges the validity of a search warrant. *See generally* Motion. While both parties recite certain facts extrinsic to the warrant, there is no material disagreement between their versions of those facts, obviating the need for an evidentiary hearing. *Compare* Motion at 2-3 *with* Government's Objection to Defendant's Motion To Suppress, etc. ("Objection") (Docket No. 14) at 3-4; *see, e.g., United States v. Villegas,* 388 F.3d 317, 324 (7th Cir. 2004) ("Because the purpose of an evidentiary hearing is to resolve material factual disputes among the parties, a hearing is not required in the absence of such disputes.").

1

the bottom floor left apartment. Said structure is a white multi-unit dwelling with a covered front porch, and a grey shingled roof. Said dwelling is further described as 'Attachment A' to this affidavit." Application and Affidavit for Search Warrant ("Application"), Exh. 1 to Motion, at 1-2 & 3 n.1. The Application listed the owner/occupant of the location to be searched as Justin Woodbury. *See id*. at 1. In an incorporated affidavit, MacVane stated that on or about May 5, 2005 he spoke with Sergeant R. Michael Denbow, who passed along information from a confidential source, SOI#1. *See id*. at 3, ¶ 2. MacVane added that the identity of SOI#1 was known to Denbow, to whom SOI#1 had previously provided truthful information, and that SOI#1 was cooperating out of concern for the community. *See id*. at 3 n.2. MacVane did not know whether SOI#1 was facing any charges. *See id*. MacVane averred that he learned from Denbow:

    A)    That on or about May 5th[,] 2005, a SOI#1 contacted (Sgt. Denbow) and reported that once a week[,] on . . . Friday evenings, Kenneth DURGIN AKA J.D. drives into Portland, ME, and purchases cocaine from an unknown source. The address of the source is unknown, however the SOS name is Mike LNU, he is married, and has a handicap[ped] daughter.

    B)    After DURGIN picks up the cocaine in Portland he travels to an apartment on Lamb Street in Windham, Maine where he delivers the cocaine to a Justin WOODBURY.

    C)    Woodbury then "cuts" (slang for increasing the amount of cocaine by adding other materials) the cocaine at his (WOODBURY'S) apartment and further distributes the cocaine throughout Gorham, Windham and surrounding areas.

    D)    The SOI#1 reported seeing DURGIN delivering a "brick size" block of cocaine to WOODBURY at the Lamb Street location on or about April 5th[,] 2005.

    E)    05-08-2005 1740 hrs., CI contacted Sgt. Denbow via telephone to report having subsequent information regarding WOODBURY. CI reported to Sgt. Denbow [that] he/she spoke to Woodbury on or about May 7th[,] 2005, during which time WOODBURY to[ld] the CI that he (WOODBURY) recently purchased a .40 or .44 caliber pistol[.] WOODBURY further bragged to the

        SOI#1 that he (WOODBURY) was a convicted felon.[2]

    F)    The SOI#1 added that two of WOODBURY'S drug customers were Kenneth DURGIN'S stepfather and the stepfather's roommate.

*Id*. at 3-4, ¶ 2.  MacVane also stated that on September 9, 2005 he spoke with another officer, Robert Hunt of the Windham Police Department.  *See id* at 4, ¶ 3.  Hunt relayed to MacVane that the previous day, September 8, 2005, he had stopped a white Camaro for speeding after observing it rapidly accelerating from Lamb Street in Windham onto Route 35.  *See id*. at 4, ¶¶ 3(a)-(c).  Hunt noticed that the lone driver, SOI#2, appeared nervous and asked why.  *See id* at 4, ¶ 3(c).  SOI#2 shrugged and said that he/she was just nervous.  *See id*.  Hunt asked SOI#2 who he/she knew on Lamb Street, and SOI#2 said he/she had just come from Justin Woodbury's apartment.  *See id*.  MacVane went on:

> Officer Hunt told me that he was familiar with WOODBURY from previous police related intelligence reports as being a distributor of cocaine.  SOI#2, without prompting, advised Officer Hunt who further advised me, by stating words to the effect of, that he/she knew what he (Officer Hunt) was thinking and that he/she was not into that kind of thing.  Officer Hunt told me that he (Officer Hunt) understood the operator's comments to mean [that] he/she was a suspected cocaine trafficker.

*Id*. at 4-5, ¶ 3(d).  Saying that he/she had nothing to hide, SOI#2 invited Hunt to search his/her car, which Hunt did, finding nothing.  *See id*. at 5, ¶¶ 3(d)-(e).  When SOI#2 continued to appear nervous, Hunt asked if he/she was worried about anything.  *See id*. at 5, ¶ 3(e).  "SOI #2 told Officer Hunt . . . that the SOI#2 wanted to talk with someone about illegal activities that he/she knew about, but was concerned about being seen on the side of the road talking with the police."  *Id*.  Hunt inquired whether SOI#2 wished to talk to him about Justin Woodbury; SOI#2 confirmed that he/she did, but did not want his/her name used if his/her information led to police response against Woodbury because he/she

---

[2] It is apparent that MacVane's references to "CI" in this paragraph were meant to be references to "SOI#1."

feared retribution from Woodbury's drug-trafficking organization. *See id*.[3] Hunt later met SOI#2 at a variety store where SOI#2 told him:

- ? that the (SOI#2) has been a frequent visitor to Justin WOODBURY's apartment; and

- ? that on several occasions he/she had been present while WOODBURY prepared cocaine for distribution, and that WOODBURY receives weekly quantities of cocaine, and that the best time to "hit him" (WOODBURY) with cocaine is on the weekends.

- ? [t]hat WOODBURY had recently purchased a new Ford SUV for $9000.00 cash, which he/she believed was purchased with proceeds derived from drug trafficking.

- ? [t]hat Woodbury offered the (SOI#2) cocaine during his visit on September 8th[,] 2005, though he/she claimed not to have observe[d] it (cocaine).

- ? . . . that Woodbury displayed, and further allowed SOI#2 . . . to handle[,] a .40 caliber handgun; and

- ? that WOODBURY'S handgun is kept in a closet within WOODBURY'S apartment.

- ? [t]hat WOODBURY is a convicted felon and does not carry the gun away from his apartment.

- ? [t]hat WOODBURY primarily deals his cocaine to lower level customers throughout Windham and Gorham, Maine, particularly the Little Falls Area of Gorham.

- ? [that] Woodbury transports his cocaine concealed in his pants, pinned near his zipper to avoid detection; and

- ? that Woodbury only deals in cocaine.

*Id*. at 5-6, ¶ 3(f). MacVane added that he (MacVane) was "aware, through prior law enforcement

---

[3] MacVane described SOI#2 as a minor and a resident of Windham, Maine. *See* Application at 4 n.3. Per MacVane, SOI#2 faced no charges from the Windham Police Department and was cooperating out of fear of Woodbury's drug-trafficking organization. *See id*. MacVane knew SOI#2's identity. *See id*.

4

contacts, that WOODBURY and other member[]s of his drug trafficking organization have committed acts of violence and have been in possession of firearms." *Id*. at 6, ¶ 4.  He concluded: "Therefore, . . . I believe that there is probable cause that Justin WOODBURY/ DOB: 05-15-1981, is committing the crime of trafficking cocaine.  And that this crime is being committed at or on the curtilage of, #7 Leisure Lane[,] Windham, Maine." *Id*. at 6, ¶ 5.

On September 9, 2005 Maine District Court Judge Andrew Horton signed a warrant authorizing search of "#7 Leisure Lane[,] Windham, Maine[,] believed to be the bottom floor left apartment.  Said structure is a white multi-unit dwelling with a covered front porch, and a gray shingled roof." Search Warrant ("Warrant"), Exh. 2 to Motion, at 1; *see also* Motion at 2; Objection at 3.  The Warrant identified Justin Woodbury as the owner or occupant of the premises.  *See* Warrant at 2.

On September 9, 2005 multiple officers, including MacVane, Windham police officers and federal agents, attempted to effectuate the Warrant at #7 Leisure Lane, bottom-floor left apartment. *See* Motion at 2; Objection at 3.  When MacVane knocked on the door of the bottom-floor left apartment, its occupant informed him that Woodbury did not live there and redirected the officers to the top-floor apartment on the left.  *See id*.  The officers proceeded to that apartment, knocked loudly on the door and requested that Woodbury open it.  *See id*.  They heard some noises emanating from inside the apartment.  *See id*.  After a brief wait, they announced themselves as police with a search warrant.  *See id*.  MacVane used a ram to forcibly open the door.  *See id*.  Once inside, officers discovered and detained the defendant and searched the apartment, seizing a firearm, drug paraphernalia and other items.  *See* Motion at 2-3; Objection at 3-4; *see also* Exhs. 3-4 to Motion. After being read the *Miranda* warnings, Woodbury was interrogated and made inculpatory statements.

*See* Motion at 3; Objection at 4; Exh. 1 to Objection.[4]

## II. Analysis

Woodbury identifies three errors on the basis of which he seeks suppression of the firearm and other items seized from his apartment and statements he made on September 9, 2005: that (i) the Warrant did not permit search of his apartment but rather a different apartment, (ii) in any event, the Warrant failed to provide probable cause as to the location at #7 Leisure Lane, and (iii) the Warrant failed to establish probable cause as to the existence of criminal activity or contraband at #7 Leisure Lane. *See* Motion at 4-5. The government defends the validity of the Warrant and the search conducted pursuant thereto and, alternatively, invokes the so-called *Leon* good-faith exception. *See* Objection at 5-13; *see also United States v. Leon*, 468 U.S. 897, 922-25 (1984). As to all points raised, I conclude that the government has the better of the argument. Hence, I recommend that the motion to suppress be denied.

### A. Particularity of Description

The defendant's first point implicates the command of the Fourth Amendment that "no warrants shall issue, but upon probable cause, and particularly describing the place to be searched." *United States v. Bonner*, 808 F.2d 864, 866 (1st Cir. 1986) (citation and internal punctuation omitted). The "manifest purpose" of this particularity requirement "is to prevent wide-ranging general searches by the police." *Id*. As the First Circuit has observed: "The test for determining the adequacy of the description of the location to be searched is whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any

---

[4] Per *Miranda v. Arizona*, 384 U.S. 436 (1966), an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at
(*continued on next page*)

reasonable probability that another premise might be mistakenly searched." *Id*. (citations and internal quotation marks omitted).

The defendant contends that, in this case, (i) the Warrant unequivocally identified only one apartment – the bottom-floor left apartment – as the premises to be searched, and (ii) officers did in fact understand the Warrant as permitting the search of that apartment, which is precisely where they headed on arrival at #7 Leisure Lane. *See* Motion at 5; Defendant's Response to the Government's Objection to Defendant's Motion To Suppress Evidence, etc. ("Reply") (Docket No. 16) at 1-3. Therefore, in the defendant's view, the Warrant clearly did not authorize search of an apartment on the top floor, left hand side, of #7 Leisure Lane. *See id*. The government rejoins that, while officers incorrectly believed that the defendant's apartment was located on the bottom floor, what they sought, and what the Warrant authorized, was permission to search the apartment belonging to Justin Woodbury at #7 Leisure Lane. *See* Objection at 5-7. I agree.

"[S]earch warrants and affidavits should be considered in a common sense manner, and hypertechnical readings should be avoided." *Bonner*, 808 F.2d at 868; *see also, e.g., Commonwealth v. Cohen*, 382 N.E.2d 1105, 1107 (Mass. App. Ct. 1978) ("[N]either warrants nor their supporting affidavits require a conveyancer's precise language, and the rigors of an average criminal investigation are not to be intensified by a pecksniffian attention to noncrucial detail on review.") (citations and internal quotation marks omitted). In keeping with that spirit, the First Circuit has ruled that a mistaken address, or omission altogether of an address, does not invalidate a search warrant in circumstances in which, in the totality of the circumstances, there was no reasonable probability that another premises might mistakenly be searched. *See, e.g., United States v. Cunningham*, 113 F.3d

---

478-79.

289, 294 (1st Cir. 1997) (wiretapping warrant valid when, despite its seriously confusing language, both judge and executing officer knew what had been proposed and authorized); *Bonner*, 808 F.2d at 866-67 (description of premises adequate despite inadvertent omission of address when "agents, having previously conducted the surveillance, knew exactly which house they wanted to search, described it accurately and in detail in their affidavit, and searched only that house without delay after the warrant issued").

Inasmuch as appears, the First Circuit has not had occasion to consider whether a warrant identifying the wrong unit in a multi-unit building is sufficiently definite when it correctly identifies the name of the unit occupant. As the defendant points out, a search warrant for an apartment house, hotel or other multiple-unit building usually is held invalid if it fails to describe the particular unit to be searched with sufficient definiteness to preclude an indiscriminate search of one or more units. *See* Reply at 4; *see also, e.g., United States v. Higgins*, 428 F.2d 232, 234-35 (7th Cir. 1970); *United States v. Rivera Rodriguez*, 768 F. Supp. 16, 18 (D.P.R. 1991). On the other hand, as noted in *Rivera Rodriguez* – one of the cases the defendant cites – accurate identification of the name of the unit occupant typically has been held adequate to satisfy the Fourth Amendment's particularity requirement. *See Rivera Rodriguez*, 768 F. Supp. at 21 n.5 ("We note that a search warrant directed against a multi-occupancy structure which fails to accurately describe the particular subunit to be searched will not ordinarily be held invalid when it adequately specifies the name of the occupant of the subunit."); *see also, e.g., United States v. Bedford*, 519 F.2d 650, 655 (3d Cir. 1975) (warrant was sufficiently definite when it specified address of multi-unit building and name of person whose apartment was to be searched); *United States v. Vaughan*, 875 F. Supp. 36, 42-43 (D. Mass. 1995) (same).

Here, there is a twist: the combination of a wrong apartment description (bottom left versus top left) with an accurate listing of a unit occupant's name. Does that invalidate the Warrant? I think not.

8

In this case, affiant MacVane made clear that he sought to search the apartment of Justin Woodbury, that Woodbury lived in a multiple-unit building at #7 Leisure Lane in Windham, and that MacVane *believed* the precise location of Woodbury's apartment was the bottom-floor, left hand side. *See* Application at 1-2. In parallel fashion, the Warrant likewise made clear that police were authorized to search the unit of Justin Woodbury at #7 Leisure Lane, *believed* to be the bottom-floor, left apartment. *See* Warrant at 1-2. This description was sufficient – as it would have been had the Warrant merely stated that it authorized the search of the apartment of Justin Woodbury at #7 Leisure Lane – "to enable the executing officer to locate and identify the premises with reasonable effort[.]" *Bonner*, 808 F.2d at 866 (citations and internal quotation marks omitted)*; see also, e.g., United States v. Dollson,* No. CRIM.A. 04-CR-402, 2004 WL 2577551, at *3 (E.D. Pa. Oct. 25, 2004) ("[C]ourts have authorized warrants listing the name of an apartment's occupant or describing its physical characteristics, even if an address is incorrect or unavailable."). That, indeed, was precisely what executing officers did upon arriving at #7 Leisure Lane: locate the Woodbury apartment with a modicum of effort. There was no reasonable probability that the wrong unit would have been searched.

The Warrant accordingly authorized the search that transpired of the defendant's apartment, describing it with sufficient particularity to pass constitutional muster despite MacVane's mistake as to the unit's precise location within the multiple-unit #7 Leisure Lane.

### B. Probable Cause: Nexus Element

The defendant next challenges the probable-cause underpinnings for issuance of the Warrant. *See* Motion at 5-9. As an initial matter, he asserts that the MacVane affidavit fails to demonstrate any nexus between the #7 Leisure Lane address (which neither confidential source mentions) and the

defendant or his alleged criminal activity.  *See id*. at 5-6.

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed – the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched – the so-called 'nexus' element."  *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005) (citation and internal quotation marks omitted).  Both the issuing magistrate and a subsequent reviewing court look to "the totality of the circumstances indicated [within the four corners of] a supporting affidavit" to assess the existence *vel non* of probable cause.  *United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir. 1996).  "Yet such review cannot start from scratch.  A magistrate's determination of probable cause should be paid great deference by reviewing courts."  *Id.* (citation and internal quotation marks omitted).

"In determining whether the nexus element is satisfied, a magistrate has to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Ribeiro*, 397 F.3d at 48-49 (citation and internal punctuation omitted).  "Put differently, the application must give someone of reasonable caution reason to believe that evidence of a crime will be found at the place to be searched."  *Id*. at 49 (citation and internal quotation marks omitted).

As the defendant argues, *see* Motion at 5, the two confidential sources described in MacVane's affidavit discussed the defendant's connection to Lamb Street in Windham but not to #7 Leisure Lane, *see* Application at 3-6.  Nonetheless, MacVane (i) asserted at the outset of his affidavit that he was investigating a case involving illegal use and trafficking of cocaine by the defendant at #7 Leisure Lane in Windham, *see id* at 3, ¶ 1, and (ii) relayed reports from SOI#1 and SOI#2 of criminal activities allegedly occurring at the defendant's apartment, *see, e.g., id*. at 3, ¶ (2)(C) (noting that, per SOI#1, "Woodbury then 'cuts' . . . the cocaine at his (WOODBURY'S) apartment"), 4, ¶(3)(c)

(SOI#2 "had just come from Justin WOODBURY'S apartment" when stopped by Hunt) & 5, ¶ 3(f) (SOI#2 had been "a frequent visitor to Justin WOODBURY'S apartment" and had been present on several occasions while Woodbury prepared cocaine for distribution). The references contained in the MacVane affidavit to a Lamb Street apartment are ambiguous; one could just as easily conclude that it is a different apartment than the defendant's as that it is one and the same. *See generally id*. In short, the affidavit sufficed to permit a reviewing judge to believe that evidence of a commission of a crime (cocaine trafficking) would be found at the defendant's apartment, which MacVane had determined was located at #7 Leisure Lane in Windham.

### C. Probable Cause: Reliance on Confidential Sources

The defendant next, and finally, attacks the probable-cause underpinning of the Warrant on the bases that (i) the MacVane affidavit failed to establish the reliability of either confidential informant, (ii) there was insufficient probable cause to establish that the defendant was a felon in possession of a firearm, and (iii) the evidence provided by SOI#1 was stale. *See* Motion at 6-9.

As the First Circuit has observed, an affiant need not necessarily assess (or otherwise vouch for) the credibility of informants to demonstrate probable cause for issuance of a warrant. *See, e.g., Schaefer*, 87 F.3d at 566 ("[A]n informant's tales need not invariably be buttressed by extensive encomia to his veracity or detailed discussions of the source of his knowledge. While an informant's truthfulness and basis of knowledge are highly relevant in determining the value of his report, the [Supreme] Court has cautioned that these elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case.") (citation and internal quotation marks omitted); *see also, e.g., United States v. Spinosa*, 982 F.2d 620, 626 (1st Cir. 1992) ("The affidavit must be viewed in its entirety, and must be given a common-sense and realistic, rather than a hypertechnical interpretation.") (citations and internal quotation marks omitted).

Informants' credibility can be established in multiple ways, including:

1. Consistency among independent reports. *See, e.g.*, *Schaefer*, 87 F.3d at 566 ("Courts often have held that consistency between the reports of two independent informants helps to validate both accounts.").

2. Declarations against penal interest. *See, e.g., id.* ("The fact that an informant's statements are against his or her penal interest adds credibility to the informant's report.").

3. Consistency with information provided by "ordinary citizens" (such as complaints by neighbors that an individual was cultivating marijuana) – a type of report that enjoys "special stature since information provided by ordinary citizens has particular value in the probable cause equation." *Id*.

4. Corroboration by external data. *See, e.g., id.* at 567 ("The record contains several external data (i) confirming the identities and predilections of Crawford, Spellman, and other growers in the group, (ii) pinning down Crawford's and Spellman's involvement with cannabis cultivation, and (iii) demonstrating the group's access to marijuana plants that were being grown indoors.") (footnote omitted).

5. Self-authentication "through the very specificity and detail with which [an affidavit] relates the informant's first-hand description of the place to be searched[.]" *United States v. Zayas-Diaz*, 95 F.3d 105, 111 (1st Cir. 1996).

In this case, the reliability of the reports of SOI#1 and SOI#2 was adequately established by:

1. MacVane's representation that SOI#1 had previously provided truthful information to Denbow and was cooperating out of concern for the community.

2. The manner in which Hunt obtained information from SOI#2, a minor who was not facing any criminal charge, had essentially volunteered the information after having been stopped for a

speeding violation, and expressed sufficient fear of the defendant's drug-trafficking organization that he/she did not want to be seen speaking to police.

3.      Cross-corroboration between the reports of both confidential sources (both of whom described the defendant as engaged in cocaine trafficking and having bragged about, or displayed, a firearm he had recently purchased).

4.      MacVane's asserted awareness, from prior law-enforcement contacts, that the defendant and other members of his drug-trafficking organization had committed acts of violence and been in possession of firearms.

5.      Hunt's asserted familiarity with the defendant from previous police-related intelligence reports as being a cocaine distributor.

Nor was SOI#1's evidence, which was approximately four months old at the time of the Warrant application, too stale to be taken into consideration. "Staleness must be evaluated in light of the particular facts of the case and the nature of the criminal activity and property sought." *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991). "When the evidence sought is of an ongoing criminal business of a necessarily long-term nature, such as marijuana growing, rather than that of a completed act, greater lapses of time are permitted if the evidence in the affidavit shows the probable existence of the activity at an earlier time." *Id*. By these lights, four-month-old evidence of cocaine trafficking, freshened by day-old evidence suggestive of an ongoing operation, readily can be discerned to have no staleness problem. *See, e.g., United States v. Feliz*, 182 F.3d 82, 87 (1st Cir. 1999) (three-month-old evidence of drug transactions not stale; "courts have upheld determinations of probable cause in trafficking cases involving similar or even longer periods"); *Greany*, 929 F.2d at 525 (two-year-old evidence of existence of marijuana-growing venture not stale); *United States v. Reiner*, 382 F. Supp.2d 195, 198-99 (D. Me. 2005) (given existence of advertisements

contemporaneous with warrant application suggesting that health club was engaged in business of prostitution, "slightly more distant but still recent historical data [suggesting the same] were also relevant.") (footnote omitted).

Finally, even assuming *arguendo* that the MacVane affidavit failed to establish probable cause to believe that the defendant was a felon in possession in a firearm, that is – as the government suggests – beside the point. *See* Objection at 11. The affidavit established probable cause to believe that the defendant had committed the crime of cocaine trafficking and that fruits of that crime would be found in his apartment. The search via which the firearm was discovered therefore was lawful.

### D. *Leon* Good-Faith Exception

Should the court agree that the Warrant sufficiently describes the defendant's apartment as the place to be searched and is supported by probable cause, that determination will be dispositive of the motion to suppress. However, even assuming *arguendo* that the court finds the Warrant deficient, I recommend denial of the motion to suppress based on the so-called *Leon* good-faith exception. Pursuant to this doctrine, "[e]vidence seized in violation of the Fourth Amendment is admissible in court if the government placed an objectively reasonable reliance on a neutral and detached magistrate judge's incorrect probable cause determination." *United States v. Crosby,* 106 F. Supp.2d 53, 58 (D. Me. 2000), *aff'd*, 24 Fed. Appx. 7 (1st Cir. 2001) (citation and internal quotation marks omitted). The *Leon* exception is itself subject to exceptions:

> There are four exclusions to the *Leon* good-faith exception: (1) when the magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his detached and neutral judicial role; (3) where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where a warrant is so facially deficient – i.e. in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid.

*United States v. Owens*, 167 F.3d 739, 745 (1st Cir. 1999) (citation and internal punctuation omitted).

The defendant invokes the fourth exception, arguing:

> [T]he Agent knowingly acted outside the scope of the warrant by forcibly entering an apartment clearly not designated by the Search Warrant. There is absolutely no doubt that the agents knew that they were about to search an apartment that they were not authorized to search in accordance with the search warrant. This was obvious as they climbed the stairs to an alternative apartment in the building.

Reply at 7.[5]

The defendant overstates his case. As noted above, the Warrant is most sensibly read as authorizing a search of the defendant's apartment located at #7 Leisure Lane. Even if, contrary to my recommendation, the court were to find the Warrant's description constitutionally inadequate, it was not so facially deficient that executing officers could not reasonably have presumed it to be valid.

### III.  Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress evidence be **DENIED.**

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the*

---

[5] The defendant originally adverted to the first *Leon* exception, arguing that "the good[-]faith exception is not available when the affiant intentionally omitted facts or was reckless in preparing the affidavit by not including information which was known or easily accessible to him." Motion at 9 (citation and internal quotation marks omitted). However, he has proffered no evidence tending to show intentional or reckless omission of facts.

*objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 24th day of May, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge